#### IN THE

# SUPREME COURT OF TENNESSEE,

##### FOR THE

# WESTERN DIVISION.

JACKSON, . . . . . . . . . . . . APRIL TERM, 1876.

THE CITY OF MEMPHIS *v.* W. M. FARRINGTON *et als.,*
and
STATE OF TENNESSEE *v.* M. J. WICKS *et als.*

THE CITY OF MEMPHIS *v.* C. S. FENNER and BLUFF
CITY INSURANCE CO., *et als.*

1. TAXATION. *Corporations. Charter exemption from taxation. Capital stock. Shares of stockholders. Constitutional law.* The capital stock in a corporation, and the shares thereof owned by the stockholders, are two distinct properties, and an exemption of the one does not thereby necessarily exempt the other, nor the taxation of the latter operate as a tax on the former, so as to interfere with the exemptions from such burdens.

2. SAME. *Same. Same.* It was not the intention of the Legislature by the clause contained in the charters in these cases, to-wit: "That said company shall pay the State an annual tax of one-half of one per cent. on each share of the capital stock subscribed," or in others, "capital stock paid in," "which shall be in lieu of all other taxes," etc., to exempt both capital stock and the shares of stock from taxation, and such shares of stock are liable to be taxed as provided by the Legislature.

### FROM SHELBY.

Appeal from the Chancery Court. L. P. WALKER, Chancellor.

W. M. RANDOLPH for plaintiff.

McKISSICK & TURLEY for defendants.

FREEMAN, J. delivered the opinion of the court.

An opinion was delivered at last term in the cases referred to above, but the court not being satisfied with the conclusion then reached, held them up for further consideration and review of the questions involved. We have had laid before us additional arguments by counsel of more than ordinary ability and learning, to which we have given attention. We now proceed to give our conclusions upon this reinvestigation of the questions involved.

By the revenue act of 1869, sec. —, it is enacted "that no tax shall be hereafter assessed upon the capital of any bank or banking association, or any other joint stock company organized under the authority of the State or of the United States; but the stockhold-

ers in such banks or banking associations, or other corporations, shall be assessed or taxed upon *the value* of their shares of stock therein."

The act of 1869–70, ch. 81, sec. 1, provides "that all shares of stock in any bank, corporation, or company now or hereafter incorporated by or in pursuance to any law of this State, or any other State, and all public bonds or stocks, except United States bonds, which, by the laws of the United States, are expressly exempt from taxation, shall be valued and assessed and subject to taxation."

Under the provisions of the above sections the State, the county of Shelby, and the city of Memphis, claim the right to tax the shares of stock owned by the stockholders in the various banks and other incorporated companies, parties to these suits.

The right to impose and collect these taxes is resisted by the stockholders under certain clauses in their charters giving exemption from taxes, except as therein specified, that these exemptions are contracts, and that to enforce the taxes thus imposed is to impair the obligation of these contracts in violation of art. 1, sec. 10 of the Constitution of the United States.

The clauses of the charters relied on may be divided into two classes, the first having a clause substantially as in the Hernando Insurance Co., as follows: "Said institution shall pay to the State an annual tax of one-half of one per cent. on each share of capital stock, which shall be in lieu of all other taxes." In some of the charters it is on all "cap-

ital stock paid in;" in others, on "capital stock sub-scribed." This variation in the language is perhaps unimportant in the decision of the questions made.

The other class of charters have clauses substan-tially as in the Merchants Insurance Co., "that a bonus to the State of one-half of one per cent. upon their capital stock be paid for the use of common schools in the State of Tennessee." In this class there are no words of exemption as found in the first, so that the question in reference to them is the effect of the agreement to pay the bonus of one-half of one per cent. on the power of the State to impose a tax on the shares of stock held by individuals in said companies upon their value. This class was disposed of at previous term of the court, and need not be noticed.

The simple question presented in the first class of cases is, whether the clauses of the charters, one of which we have cited, exempts the shares of stock owned by the stockholder from taxation as property in his hands. In other words, whether this kind of property in the hands of individuals in these particu-lar corporations shall bear its due proportion of the public burdens by being assessed to the owner at its market value, or shall be exempted from these bur-dens under the operation of the assumed contract con-tained in the charters of these corporations.

It is obvious that the questions presented are of large interest, and likely to be of increased importance to the people of the State in proportion as the capi-tal of the country shall seek investment in such cor-

porations as have charters containing such clauses. We have endeavored to give that attention to the investigation of these cases which their importance demands at our hands.

What, then, is the legal effect and extent of the clauses in the charters before us, in reference to the liability of the shares of stock to be taxed by the State? What is the true construction and meaning of the clauses of these charters, is a question on which it is claimed we are bound by the authority of the decisions of the Supreme Court of the United States, inasmuch as on the question of whether the act of the Legislature of Tennessee imposing the tax on the shares of stock impairs the obligation of the contract contained in the charters, our decision may, in one event, be revised by the Federal Supreme Court. We, therefore, look to the decisions of that court as furnishing the guide to the conclusions to be reached on the questions before us.

The leading case on this question, and the one most pressed on our consideration as conclusive in favor of the position of the corporations, is the case of *Gordon* v. *Appeal Tax Court,* 3 How., 133. That case was substantially this: In 1813 and 1821, certain acts of the Legislature of Maryland were passed extending the charters of various banks in the State, the first to 1835, the second to 1845, upon compliance by the banks with certain conditions in the acts mentioned, that is, the building and completion of certain turnpike roads deemed important to the State,

and the payment of a certain sum on their capital stock into the treasury of the State.

The 11th section of each of the above mentioned acts of the Legislature (the terms of which were accepted by the banks then in existence), contained the following language: "That upon any of the aforesaid banks accepting of and complying with the terms and conditions of this act, the faith of the State is hereby pledged not to impose any further tax or burden upon them during the continuance of their charters under this act."

Gordon was the owner of shares of stock in the Union Bank, which had accepted the conditions of the acts extending the charters referred to. In 1841 the Legislature of the State of Maryland passed a law authorizing the assessment and collection of taxes on all shares of stock in any bank or company incorporated by the State. Gordon resisted the collection of the tax on the bank stock owned by him, on the ground that it was exempt from taxation under the 11th section of the act, as above quoted, that the same was a contract, and to collect the tax was to violate the provision of the Constitution of the United States forbidding any State passing a law impairing the obligation of contracts.

The court held, as a matter of fair construction of the 11th section in connection with the entire history of the propositions to the banks for the extension of their charters, and the acceptance of the terms offered them with the burdens imposed; that the intention of the Legislature was to exempt the stockholders from

taxation on account of their stock owned in these banks; that is, that the shares of stock were exempt from taxation under the 11th section of the acts we have quoted.

From a careful examination of the opinion of the court, however, it clearly appears that this conclusion was not arrived at by fixing this as the definite and certain meaning of the words used, or rather by laying down arbitrarily that such was the necessary meaning of like terms used in all cases independent of other facts, but was arrived at by taking into view the surrounding and attendant circumstances of the transaction, and from these, in connection with the language used, ascertaining what was the intention and purpose of the Legislature as expressed in the language of the sections quoted. That the exemption of the shares of stock in the hands of stockholders was declared in connection with the other facts in the case as a simple matter of construction of this transaction between the State and the banks, we think, is not only clear from the reasoning of the court, but is settled by subsequent construction given to the opinion in this case by Judge Nelson in the case of *People* v. *Commissioners,* 4 Wal., 259. In this case he cites the language of the court in previous case. *Van Allen* v. *The Assessors,* 3 Wal., 573, holding distinctly that "the tax on shares of stock is not a tax on the capital of the bank," and that the shares are "a distinct, independent interest or property held by the shareholder like any other property that may belong to him, and subject to taxation." The question was

35—VOL. 8.

the liability of shares in national banks to taxation, where the capital stock was invested in United States bonds which could not be taxed. So that the court held, as it has uniformly done on the same question, that the capital stock and shares of stock were distinct properties, therefore an exemption of the one did not exempt or include necessarily the other. It was argued in this case that the principle announced was in conflict with the case of *Gordon* v. *Appeal Tax Court;* but the court say this was a mistake, "that case turned upon the construction of an act of the Legislature of Maryland exempting the bank from taxation on account of a large bonus to the State for the extension of the charter. The court held, says Judge Nelson, that upon a true construction of the acts of 1813 and 1821, the stockholders were within the scope of the exemption. He then cites from the Gordon case, as showing the ground of that opinion, the language, "that it appears from the 11th section of the acts to have been the intention of the Legislatures which passed them to exempt the stockholders from taxation as persons on account of the stock which they owned in the banks."

In a late case which has been furnished us, *W. B. Minatt, Jr.,* v. *Phil. & W. & B. R. R. Co. et als.,* decided at October term, 1873, by the Supreme Court of the United States, opinion by Judge Field, a clause of an act of incorporation providing that "every company of the class therein designated should, in addition to other taxes, pay to the treasurer of the State for its use one-fourth of one per cent. upon the ac-

tual cash value of every share of its capital stock,"
was held not to be a tax on the shares of the indi-
vidual stockholders, or upon the property of the cor-
poration, but a tax on the corporation itself, deter-
mined by a rule which, though arbitrary, yet approxi-
matively just.   In this case the collection of the tax
was resisted on the ground that it was a tax on the
shares of stock, the owners of which resided in other
States, and therefore not subject to° be taxed by the
State of Delaware, but the court held the tax valid
as not being on the shares but on the corporation,
enunciating again the doctrine, with emphasis, that
the shares of stock were different and distinct prop-
erty from the capital stock, the former, the individual
property of the stockholder, having no locality inde-
pendent of his domicil, the latter the property of the
corporation.

It being settled, as we think, as the view of the
Supreme Court of the United States, and, as we think,
most properly, that the capital stock and shares of
stock are two distinct properties, and that an exemp-
tion of the one does not thereby necessarily exempt
the other, nor the taxation of the latter operate as a
tax on the former so as to interfere with its exemp-
tion from such burdens, the question then before us
is, whether it was the intention of the Legislature, by
the clause contained in the charters before us, to ex-
empt both capital stock and the shares of stock from
taxation, and whether these stocks are now liable to
be taxed as provided by the Legislature.

In the Gordon case there are several elements

which may fairly distinguish it from the present cases. First, there was a *bona fide* and real purchase of the franchise, to-wit, the extension of the charters, and a real consideration paid for the exemptions given.

In the language of Judge Wayne, "the Legislatures which passed the acts had in view the construction of the Cumberland and Boonesborough turnpike roads, and the establishment of a school fund. They designed to accomplish these objects by making some of the banks construct the roads, and all of them contributors to the school fund as the price for their charters." The conclusion of the court was, that having thus bought and paid for, or agreed to pay for, the franchise, such a contract was limitation upon the taxing power of the Legislature, forbidding the imposition of any further tax on the franchise thus purchased. The judge distinguishes this from the case of land purchased from the State by saying in the one case the land is bought subject to contribute its portion of the burdens of the State, "but a franchise for banking, when bought the price is paid for the use of the privilege while it lasts, and any tax upon it would substantially be an addition to the price," a distinction, we confess, in which the difference is, to say the least of it, not perfectly clear. In the next place, these banks were actually existent corporations, competent to contract, and in making the contract the stockholders were required to be and were actual parties assenting to the terms and agreeing to pay for the benefits conferred, and stipulated for the additional benefits, to-wit, the exemption from any further

tax or burden upon them during the continuance of their charter. They might well have been held in this case to have been stipulating for a benefit in favor of their private property, to-wit, shares of stock. Having determined that the contract of purchase was a limitation on the power to impose any tax on the franchise, the judge, in the next place, proceeds to settle the question that the exemption in the 11th section extended to the shares of stock owned by the stockholders. He holds that it does. He lays down as a proposition in his reasoning that "the aggregate could not be taxed without its having the same effect upon the parts that a tax on the parts would have on the whole." In this proposition the learned judge, we think, was clearly in error, and a different doctrine now prevails in that court, as shown by the cases cited above. But he evidently puts the weight of the argument on which to rest his conclusion in the following statement: "That the Legislature, in proposing the terms and conditions of the act, use the the word 'banks' with reference to the consent or acceptance of the act being given by the stockholders according to a fundamental article of their charters. The acceptance of the terms could only be by the stockholders: they did accept, and the State recognized it as the act of the stockholders. It could not have been given in any other way. True it is, when accepted and recognized, it became a contract with the banks. But its becoming a contract with the banks determines nothing. We must look in what character or by whose assent it was to become

a contract with the State to ascertain the intention of the Legislature in making the pledge "that upon any of the aforesaid banks accepting, etc., the faith of the State is pledged not to impose any further tax or burden upon them." By this process of reasoning on these facts, he concludes substantially that as the terms were accepted by the stockholders, the contract was made with them; therefore the intention of the Legislature was, and the meaning of the contract held to be, an exemption of the property of the stockholder in the shares of stock owned by him. "Such," he says, "was manifestly the intention of the Legislature from their language, and confirmed by the attending circumstances," one of which he states to be "that it was natural that the stockholders, knowing, as they did, that a tax upon the franchise of the banks would not exempt them from other taxation, stipulated in both instances that a provision should be introduced into the acts surrendering the State's right to tax them further than they were about to be by the acts in question.

The state of the case in the charters before us is simply this: certain persons wishing to establish a bank or insurance company, as the case may be, procure a bill to be introduced into the Legislature, by which they and their associates and successors are created a body politic and corporate under the corporate name chosen. The capital stock is limited to a certain amount generally, and divided into shares of from ten, perhaps, to one hundred dollars each; that when so much of this capital stock is paid in, the stockhold-

ers may meet and elect directors, and the directors a president and other officers, and make by-laws. After providing for the character of business to be done by the corporate body. thus created, and other matters of detail, it is provided, as in the Bluff City Insurance Company, the substance of whose act of incorporation we have followed in the above summary, "that said company shall pay the State an annual tax of one-half of one per cent. on each share of the capital stock subscribed;" or in others, "capital stock paid in," "which shall be in lieu of all other taxes." There is no *bona fide* and real purchase for a consideration actually paid or agreed to be paid; it is simply an amount fixed to be paid by the corporate body thus created, as an annual tax. The contract, so far as it is one, is alone with the corporation thus created, the corporate body alone being party to it. No stockholders are in existence at the time; they cannot, therefore, as in the case of the Maryland Bank, be held to be stipulating for benefits or exemptions in favor of the shares of stock owned by them. The corporate body alone is stipulating as to a burden imposed on it. Call it by a legal fiction, a purchase, the body is but stipulating for the purchase of the franchise, and to acquire property in the form of capital stock, and perhaps other property necessary to carry on the business in which the company is to engage. That franchise, it must be assumed, is well known to be a property subject to the burdens of taxation as other property owned by individuals; this owned by the legal entity known as a corporation as

it owns other property. The terms of the contract, then, mean, that as to this property thus assumed to be purchased, we . stipulate for a tax on it of only one-half of one per cent. on each share of capital stock subscribed or paid in, which shall be in lieu of all other taxes on this property; that is, the franchise or privilege, and everything necessary to its enjoyment, including the use of the capital stock for the purposes of the grant, and in case of banks and the like institutions, the banking house and other property necessary for the carrying on of the business. In other words, the Legislature, in granting the franchise, with its incidents, taxes the thing granted at one-half of one per cent. on each share of stock, to which the corporation assents by accepting the charter, and binds the State, assuming the power in the Legislature to tax in this way property, a question we do not decide here, not to impose any further tax on this thing granted by the language, "which shall be in lieu of all other taxes." That is, which tax of one-half of one per cent. shall be in lieu of and substituted for all other taxes on what is granted, and is agreed to be paid on said shares of capital stock, not by the shareholder, but by the company.

If it be said the payment of the one-half of one per cent. excluded the right to tax the franchise thus granted, and therefore the stipulation against other taxation was unnecessary, we answer that in this view it is only to put this effect into the form of an express stipulation, and not leave it to be deduced as a legal result. In other words, this assumed legal

effect is made definite by express terms used in the act. This was what was intended, as we have no question; at any rate, it is the fair legal construction in view of the principle that nothing is to be included in such a grant as against the State, except what is expressly and unmistakably contracted for and clearly expressed. The simple question really is, whether a contract in express terms between the State and the corporate individual to exempt the property of the corporation shall, by construction, extend to and exempt the property of that other individual, the stockholder, property created even after the corporate contract. It can only be so held on the principle of the most extended and liberal construction of the language of the exemption, and we are bound to apply the very opposite rule in this case.

To hold that the stockholder is stipulating here for an exemption of his shares of stock is not, in the language of Judge Wayne, in the case of Gordon, "to make the relative as broad as the antecedent," but to enlarge it and make it broader, and to include within it, not the parties contracting with reference to their property then being contracted for (by construction of law), but other property to be created in the future, having no existence at the time of the contract, and that the property of another individual, to-wit, a stockholder. The construction indicated will give full effect to the language of the clauses in question, and accords with the settled doctrine that the relinquishment of the power of taxation over any species of property, is never to be presumed.

In the language of Chief Justice Marshall, "As the whole community is interested in retaining it undiminished, that community has a right to insist that its abandonment ought not to be presumed in a case in which the deliberate purpose of the State to abandon does not appear." *Providence Bank* v. *Billings,* 4 Peters, 174, Curtis's Ed.

A fuller expression of the same principle is given by Taney, C. J., in the case of the *Ohio Life Ins. & Trust Co.* v. *Deholt,* 16 How., 238, Curtis's Ed. "The rule of construction," he says, "in cases of this kind, has been well settled by this court. The grant of privileges and exemptions to a corporation are strictly construed against the corporation and in favor of the public. Nothing passes but what is granted in clear and explicit terms, and neither the right of taxation nor any other power of sovereignty which the community have an interest in preserving undiminished, will be held by the court to be surrendered, unless the intention to surrender is manifested by words too plain to be mistaken." He then adds, as considerations of much weight, with which we are all familiar, "nor does the rule rest merely on the authority of adjudged cases. It is founded in principles of justice, and necessary for the safety and well-being of every State in the Union. For it is a matter of public history, which this court cannot refuse to notice, that almost every bill for the incorporation of banking companies, insurance and trust companies, railroad companies, or other corporations, is drawn originally by the parties who are personally interested in

obtaining the charter, and that they are often passed by the Legislature in the last days of its session, when from the nature of our political institutions the business is unavoidably transacted in a hurried manner, and it is impossible that every member can deliberately examine every provision in every bill upon which he is called to act."

In view of these well-settled principles and well-known considerations, we think the construction we have given these clauses, taken in connection with the facts surrounding the grant, though strict, is sound, and carries out the intention of the Legislature in their enactment. It would have been very easy to have made the purpose of the Legislature clear to exempt the shares of stock, had such been the purpose, by saying, as the Legislature of Ohio did in the 60th section of her banking law, "that the tax should be in lieu of all taxes to which said companies, or the stockholders thereof, would otherwise be subject." This language would have been explicit—too plain to be misunderstood, or admit of any doubt as to the meaning intended to be expressed.

We are aware of the argument made against this view, and feel its force; but on the construction of the language in connection with the surrounding and attendant circumstances, we do not think it conclusive. It is said that the agreement to pay the one-half of one per cent. annually on each share of the stock by the company, exempted their franchise as property from taxation, and therefore the language, "in lieu of all other taxes," would be inoperative unless we apply it

to shield the shares of the stock in the hands of the stockholders. We do not think this is, as we have said, a conclusive answer to the view we have given. The meaning of this language is, as we construe it, that the company agrees to pay and the State to accept, an annual fixed tax of one-half of one per cent. on each share of capital stock subscribed or paid in, and this fixed sum is agreed to be paid and accepted by the State in lieu of, that is, as a substitute for, the variable taxes that may in the future be assessed and laid on the property which the company is receiving from the State, or may acquire in ' the enjoyment of its franchises. It is not in terms like the Maryland act, a pledge "not to impose any other tax or burden," but only a statement that this burden or tax agreed on is to be in lieu of or instead of any other to be paid by the company on what was granted the company by the State. The one is a pledge against any other tax or burden whatever to be imposed by the State, a contract made with stockholders owning stock at the time; the other only expresses the idea that what is imposed on the company is a substitute for any other tax to be imposed on the article, property, or privilege which has been agreed to be taxed the fixed sum agreed on. The one-half of one per cent. to be paid by the company, in a word, stands as a tax to be paid by said company on its capital stock in lieu of all other taxes, and as a protection from such on the same property, the company paying this and nothing more on the property on which it is charged. As said before, it but puts in

express terms what otherwise would be a legal inference or conclusion.

It has been urged that the stockholders became parties to the contract and entitled to the exemption by subscribing for stock in the company. We hold that the contract was complete when the act was passed, as between the parties to it, the State, and the company. The franchise was granted. The after organization was but the means by which it was to be used for the purposes of the grant. The stockholders but purchased stock in a company which company had a contract for exemption of its capital stock and franchise from all taxes except one-half of one per cent. on each share, not liable to be increased or diminished by State policy or exigency; so that so far as the State burden on the corporation in whose stock he invested was concerned, he knew how to estimate it. But as to his personal property in the share of stock, there was no contract of exemption, but the Constitution had provided it might be taxed, and had imperatively required that if taxed it should be taxed according to its value as other property.

We do not think proper to go again into a citation and review of the decisions of our various sister States in construing clauses more or less like the ones under consideration in charters. We but say that while we habitually look to these decisions with much respect, and differ with many of them with great diffidence, yet we cannot do more in our position than deem them highly persuasive evidence of what the law is. We cannot, without sacrificing the independ-

ence of our own judgments, permit them to be con-
clusive and authoritatively binding on us, where our
judgments do not approve their reasonings or conclu-
sions.     This effect can only be given decisions of our
own court, subject, however, to be overruled even as
to them, after taking into proper consideration the
weight of the reasoning, the influence proper to be
given to the doctrine of *stare decisis,* and such other
well-known considerations as are and have been long
recognized and settled in our jurisprudence as bearing
upon the question of the propriety of overruling a de-
liberate decision made by the highest tribunal of the
State.

We need scarcely add that as a matter of course,
on questions of Federal jurisprudence, we recognize
distinctly the controlling authority of the Supreme
Court of the United States.

We announce the foregoing conclusion more readily
because we have the satisfaction of knowing that if
we have erred no permanent injustice will be done,
as the subject is one that may be reviewed by the
Supreme Court of the United States, having the power
under the Constitution to settle conclusively the ques-
tion, which we desire may be done.

Decrees will be drawn in accord with this opinion
in all the cases pending dependent on the questions
herein disposed of.

McFARLAND and TURNEY, Judges, dissent.